AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>White Samsung Galaxy A32 5G cellphone,<br>IMEI No. ending in x9254, with a white sticker on the back<br>that bears the word "cricket"<br>**(Subject Cellular Telephone A-2)** | Case No. 22 - 8055 MB |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     3-4-22     (not to exceed 14 days)
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days (not to exceed 30) ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 2-18-22 @ 2:39 p.m.         _____
                                                  *Judge's signature*

City and state: Phoenix, Arizona                  Honorable John Z. Boyle, U.S. Magistrate Judge
                                                  *Printed name and title*

**ATTACHMENT A-2**

*Property to be searched*

The property to be searched is a white Samsung Galaxy A32 5G cellphone, IMEI No. ending in x9254, with a white sticker on the back that bears the word "cricket," identified as ATF property Item #3 (**Subject Cellular Telephone A-2**). **Subject Cellular Telephone A-2** is currently located in an evidence locker at 16212 N. 28th Ave, Suite 100, Phoenix, AZ 85053.

This warrant authorizes the forensic examination of the **Subject Cellular Telephone A-2** for the purpose of identifying the electronically stored information described in Attachment B.

 

# ATTACHMENT B

*Property to be seized*

1.       Any records and information found within the digital contents of the **Subject Cellular Telephones** that relate to violations of 18 U.S.C. § 922 (a)(1)(A) Dealing Firearms Without a License, and 18 U.S.C. § 924(a)(1)(A), False Statement in the Purchase of a Firearm, including:

a.       all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms, firearms parts or accessories, or ammunition;

b.       all information related to buyers or sources of firearms, firearms parts or accessories, or ammunition (including names, addresses, telephone numbers, locations, or any other identifying information);

c.       all bank records, checks, credit card bills, account information, or other financial records;

d.       all information regarding the receipt, transfer, possession, transportation, or use of proceeds of firearms, firearms parts or accessories, or ammunition;

e.       all information recording schedule or travel;

f.       all information about the cellular telephone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

g.       evidence of the attachment to the cellular telephone of another storage device or similar container for electronic evidence;

h.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the cellular telephone;

i.       evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

1

      j.     contextual information necessary to understand the evidence described in this attachment.

2.     Any records and information found within the digital contents of the **Subject Cellular Telephones** showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>White Samsung Galaxy A32 5G cellphone,<br>IMEI No. ending in x9254, with a white sticker on the back<br>that bears the word "cricket"<br>**(Subject Cellular Telephone A-2)** | Case No.  22-8055 MB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

### As further described in Attachment A

located in the District of Arizona, there is now concealed:

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18, U.S.C.§ 922(a)(1)(A) | Dealing in firearms without a license |
| 18 U.S.C. § 924(a)(1)(A) | False statement in the purchase of a firearm |

The application is based on these facts:

### See attached Affidavit of Special Agent Alejandra Barrera

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested
  under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Coleen Schoch

_____
*Applicant's Signature*

Alejandra Barrera, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2-18-22 @ 2:39 p.m.

_____
*Judge's signature*

City and state: Phoenix, Arizona

Honorable John Z. Boyle, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is a blue Apple iPhone 12 Pro Max cellphone, IMEI No. ending in x6826, with a cracked and scratched screen, identified as ATF property Item #2 (**Subject Cellular Telephone A-1**). **Subject Cellular Telephone A-1** is currently located in an evidence locker at 16212 N. 28th Ave, Suite 100, Phoenix, AZ 85053.

This warrant authorizes the forensic examination of **Subject Cellular Telephone A-1** for the purpose of identifying the electronically stored information described in Attachment B.

 

## **ATTACHMENT A-2**

*Property to be searched*

The property to be searched is a white Samsung Galaxy A32 5G cellphone, IMEI No. ending in x9254, with a white sticker on the back that bears the word "cricket," identified as ATF property Item #3 (**Subject Cellular Telephone A-2**). Subject Cellular **Telephone A-2** is currently located in an evidence locker at 16212 N. 28th Ave, Suite 100, Phoenix, AZ 85053.

This warrant authorizes the forensic examination of the **Subject Cellular Telephone A-2** for the purpose of identifying the electronically stored information described in Attachment B.

 

## ATTACHMENT B

*Property to be seized*

1.      Any records and information found within the digital contents of the **Subject Cellular Telephones** that relate to violations of 18 U.S.C. § 922 (a)(1)(A) Dealing Firearms Without a License, and 18 U.S.C. § 924(a)(1)(A), False Statement in the Purchase of a Firearm, including:

      a.      all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms, firearms parts or accessories, or ammunition;

      b.      all information related to buyers or sources of firearms, firearms parts or accessories, or ammunition (including names, addresses, telephone numbers, locations, or any other identifying information);

      c.      all bank records, checks, credit card bills, account information, or other financial records;

      d.      all information regarding the receipt, transfer, possession, transportation, or use of proceeds of firearms, firearms parts or accessories, or ammunition;

      e.      all information recording schedule or travel;

      f.      all information about the cellular telephone's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      g.      evidence of the attachment to the cellular telephone of another storage device or similar container for electronic evidence;

      h.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the cellular telephone;

      i.      evidence indicating the cellular telephone user's state of mind as it relates to the crime under investigation;

22

j.      contextual information necessary to understand the evidence described in this attachment.

2.      Any records and information found within the digital contents of the **Subject Cellular Telephones** showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Alejandra Barrera, being first duly sworn, hereby deposes and states as follows:

### I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the following cellular telephones (hereafter "**Subject Cellular Telephones**"), which represent evidence and/or instrumentalities of violations of 18 U.S.C. § 922 (a)(1)(A) Dealing Firearms Without a License, and 18 U.S.C. § 924(a)(1)(A), False Statement in the Purchase of a Firearm, to extract the electronically stored information set forth in Attachment B:

   a.  Blue Apple iPhone 12 Pro Max cellphone, IMEI No. ending in x6826, with a cracked and scratched screen, identified as ATF property Item #2 (**Subject Cellular Telephone A-1**), and further described in Attachment A-1; and

   b.  White Samsung Galaxy A32 5G cellphone, IMEI No. ending in x9254, with a white sticker  on the back that bears the word "cricket," identified as ATF property Item #3 (**Subject Cellular Telephone A-2**), and further described in Attachment A-2.

2.      I am a Special Agent with the United States Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since May 24, 2020. I have completed the Criminal Investigator Training Program (CITP) and Special Agent Basic Training (SABT) for the ATF at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I am currently assigned to the Phoenix Field Division, Phoenix Field Office, Group I. As a Special Agent in Group I, I am required to investigate violations of federal laws and regulations related to the criminal misuse of firearms. Based on my training and experience investigating violations of federal law, particularly those laws found in Title 18 and Title 21 of the United States Code (U.S.C.), criminals will often utilize electronic devices such as cellular phones to further their illegal activities.

3.      Prior to my employment with ATF, I was employed by the United States Secret Service (USSS) for four years as a Special Agent. While at the USSS, I had an integrated duty to protect and conduct financial investigations. I have worked in various capacities, such as in the Financial Task Force, Counterfeit Squad, and Counter Surveillance Division. I received specialized training in the following areas: Counterfeit currency detection, access device fraud techniques such as the skimmer application which criminals utilize to steal private and personal information off magnetic stripe cards, street gang organized crimes, and protective intelligence and threat assessment.

4.      Prior to my employment with the USSS, I was employed with the United States Customs and Border Protection as an Officer (CBPO). As a CBPO, I enforced United States customs, immigration, and agricultural laws and regulations at the Nogales, Arizona port of entry. I performed inspections and interdicted the illegal entry of individuals, prohibited goods, and contraband.

5.      The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers; surveillance conducted by law enforcement officers; analysis of public records; controlled purchase of a firearm; analysis of social media information; and analysis of financial records.

6.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

II.     **BASIS FOR PROBABLE CAUSE**

7.      On December 21, 2021, ATF Special Agents (SA) and Task Force Officers (TFOs) assisted by the Phoenix Police Department (PPD) interdicted a Barrett .50 caliber rifle from Francisco Antonio BOJORQUEZ. The firearm was originally purchased by BOJORQUEZ from Tombstone Tactical, a federal firearms licensee (FFL), in Phoenix, Arizona.

2

8.      On December 14, 2021, the Compliance Manager for Tombstone Tactical contacted an ATF SA telephonically. Mr. Keller advised that BOJORQUEZ purchased a Barrett M107A1 .50 caliber rifle with $12,900 in U.S. currency on that day. The Compliance Manager stated BOJORQUEZ mentioned he found out through the FFL's Facebook page they had received a Barrett .50 caliber and therefore, he decided to come in to purchase the firearm. The Compliance Manager informed ATF that the FFL had not advertised the Barrett .50 caliber on their Facebook page.

9.      The Compliance Manager further stated that due to what he identified as behavior conducive with straw purchasing, he told BOJORQUEZ he had received a delayed response from the National Instant Criminal Background Check System (NICS) and the FFL would be able to transfer the Barrett rifle to him within a few days. The Compliance Manager stated that BOJORQUEZ provided a cellular phone number ending in -5622, to be contacted when he should return to the FFL and complete the transfer of firearm. The Compliance Manager stated that he saw BOJORQUEZ driving a silver Mazda 6 bearing AZ temporary plate U456519 (Silver Mazda) to and from Tombstone Tactical.

10.     On December 20, 2021, I contacted Mr. Keller at the phone number provided and was informed the FFL would be contacting BOJORQUEZ in the morning of December 21, 2021, to have him come in and complete the transfer of firearm.

11.     On December 20, 2021, a query of the Arizona temporary plate U456519 revealed the permit was under the name of Francisco BOJORQUEZ, and it was valid from 08/06/2021 to 09/20/2021, which was currently expired. The Silver Mazda was registered to Nice Consulting DBA Good Fellas Auto Sales.

12.     On the same day, I queried Francisco BOJORQUEZ through law enforcement databases, and discovered BOJORQUEZ was currently living at 6217 W. Medlock Dr., Glendale, AZ 85301 (Glendale Residence). BOJORQUEZ provided a residence address of 8740 W. Glenrosa Ave, Phoenix, AZ 85037 (Phoenix Address) on the ATF Form

3

4473 with respect to the purchase of the Barrett .50 cal, According to City of Phoenix records, BOJORQUEZ's water service the Phoenix Address has been inactive since July 2020.

13.     According to the Arizona Department of Economic Security (DES) wage inquiry, BOJORQUEZ earned $217.30 during the 1st quarter of 2021 (January–March) from Arizona Galvanizing Inc. During the 4th quarter of 2020, BOJORQUEZ earned $6,557.39 from Arizona Galvanizing Inc. and $1,123.40 from Lime Logistics LLC. BOJORQUEZ filed for unemployment benefits in 2021 and exhausted his benefits after receiving a total of $6,240. DES records lists the Glendale Residence as BOJORQUEZ's home address.

14.     On December 21, 2021, at approximately 8:05 AM, I drove by the Glendale Residence. I observed the Silver Mazda parked in the driveway. I also observed the following five vehicles parked in the driveway:

1.  Black 2003 Hummer H2, AZ license plate PLIROJ, registered to Diana BOJORQUEZ (sister of Francisco BOJORQUEZ);

2.  Gray 2002 Lexus RX, AZ license plate BRR0105, registered to Krystle FLEMING;

3.  Silver 2010 Chevy Traverse, AZ temporary plate U559524, permit to Jose Angel ESTRADA-Garcia in Phoenix, AZ, registered to Interprice Motors LLC in Phoenix, AZ.

4.  Black Scion Coupe with red rims, AZ license plate GGA7LD, registered to Guadalupe VEGA-Moreno in Mesa, AZ; and

5.  Tan 1994 Jeep Grand Cherokee, AZ temporary plate WMA6WF, registered to Francisco BOJORQUEZ.

15.     On the same day, at approximately 10:00 AM, PPD air support unit initiated airborne surveillance at the Glendale Residence and observed the Silver Mazda in the middle of the street, which appeared to be occupied by at least a driver. Shortly after, a red vehicle, later to be identified as a Nissan Maxima bearing CA license plate 8KPZ794, pulled up to the Glendale Residence. A male exited the Nissan Maxima and entered the front passenger seat of the Silver Mazda. The air support unit followed the

4

Silver Mazda from the Glendale Residence to the FFL Tombstone Tactical located at 10011 N. Metro Parkway E, Phoenix, AZ 85051.

16.    At approximately 10:20 AM, the surveillance units at Tombstone Tactical observed the Silver Mazda arrive at the parking lot of the FFL. Surveillance units observed the driver exit the Silver Mazda. The driver matched the description of BOJORQUEZ. An ATF SA was inside the FFL and monitoring the security cameras. That ATF SA confirmed that the male who exited the Silver Mazda was BOJORQUEZ. The ATF SA observed the FFL transfer the Barrett M107A1 .50 BMG rifle bearing S/N AE008417 to BOJORQUEZ at approximately 10:26 AM. Surveillance units observed BOJORQUEZ exit the FFL carrying a large cardboard box containing the firearm and watched him place it in the backseat of the Silver Mazda.

17.    Upon BOJORQUEZ's departure from the FFL, the airborne surveillance unit called out BOJORQUEZ's direction of travel. The Silver Mazda was stopped by a PPD marked unit at approximately 10:30 AM in the parking lot of Metrocenter Mall located at 9617 N. Metro Parkway W, Phoenix, AZ 85051, for driving with an expired registration.

18.    After conducting the traffic stop, PPD Officers approached the Silver Mazda where BOJORQUEZ was contacted. PPD Officers identified the front passenger as Paolo ROJAS. PPD Officers confirmed that there was a large cardboard box was in the backseat of the Silver Mazda. ROJAS disclosed to the PPD Officers he had a firearm on his waistband—a Springfield XD9 9mm pistol bearing S/N XD857426—and one on the floor inside the vehicle— a Glock 22 .40 cal pistol bearing S/N 02715DPD. PPD Officers safely acquired the loaded firearms and temporarily preserved them for safety while ATF SAs interviewed ROJAS.

19.    I and ATF SA Morales were on scene at the time of the vehicle stop by PPD. PPD Officers advised us that ROJAS said he had a firearm on his waistband and another one on the floorboard of the Silver Mazda, which they safely secured.

20.     ATF SAs made contact with BOJORQUEZ, who was patted down for weapons with negative results. BOJORQUEZ agreed to step away from the Silver Mazda so that we could speak to him privately and away from ROJAS. BOJORQUEZ followed us to a shaded parking space across the Silver Mazda.

21.     We introduced ourselves to BOJORQUEZ as Special Agents with ATF. I asked BOJORQUEZ if he had any idea as to why ATF was speaking with him, and he said he had no idea. I asked BOJORQUEZ to tell us about his recent firearm purchase, he said he likes to go shooting. BOJORQUEZ confirmed that he was Francisco BOJORQUEZ with a date of birth in 1993.

22.     We asked BOJORQUEZ where he works, and he stated he works at his cousin's mattress shop as a delivery truck driver. He said he did not know the name of his cousin's company, but it was "Salgado something". BOJORQUEZ said he works Monday through Friday for 8-10 hours daily and gets paid $1,000 per week in cash. BOJORQUEZ reported working for his cousin for approximately 2-3 years. BOJORQUEZ said he was not currently at work because he was planning on picking up the Barrett .50 cal from the FFL that morning.

23.     We asked BOJORQUEZ where he currently resides. BOJORQUEZ began to say "62" (the beginning of the Glendale Residence address), and quickly retracted and provided the Phoenix address. SAs asked him for his actual address, and BOJORQUEZ then provided the Glendale Residence address. BOJORQUEZ stated he used to live at the Phoenix Address, but moved out of that house about 2-3 months ago. SA Morales advised BOJORQUEZ to be honest because some of the questions the SAs already had the answers to, and it was in his best interest to be forthcoming. BOJORQUEZ said he believed he moved out of the Phoenix Address at least two years ago. SA Morales asked BOJORQUEZ if that morning he had left from the Glendale Residence to head to Tombstone Tactical. BOJORQUEZ acknowledged by stating he stays with his sister, later identified as Diana BOJORQUEZ, and his nephews at the Glendale Residence.

6

BOJORQUEZ stated they rent the Glendale Residence and the leasing agreement is under his brother's name, Jesus BOJORQUEZ.

24.     SA Morales asked him who the other passenger in the vehicle was and BOJORQUEZ stated it was his sister's ex-boyfriend named Paul. BOJORQUEZ did not know Paul's last name. BOJORQUEZ reported meeting Paul about 2-3 months ago. BOJORQUEZ said he thinks Paul works with drywall. BOJORQUEZ stated he spoke with Paul that morning and asked him to come with him to Tombstone Tactical to pick-up the Barrett .50 cal.

25.     We asked BOJORQUEZ how many guns he has purchased, BOJORQUEZ stated he believes he purchased 10-15 guns in 2021. BOJORQUEZ stated he started purchasing guns when he was 18 years old. He mentioned purchasing a Bushmaster AR-15 rifle, Sig Sauer 1911 STX pistol, and a Ruger 57 pistol about two years ago. He also said he sold most of his firearms.

26.     SA Morales asked what type of guns he purchased in 2021. BOJORQUEZ said he purchased a M1919 Browning rifle, RPD rifle, Barrett M107A1 .50 BMG rifle, three Ruger 57 pistols, three short AKs and one long AK. SA Morales asked BOJORQUEZ where these guns were, and he said they were in storage. SA Morales asked BOJORQUEZ where he purchased these firearms and said he had bought guns from Gun Expo, Tombstone Tactical, and an FFL on Cave Creek Road that looks like an office space from the outside. Based on this description, I believe BOJORQUEZ is referring to FFL Phoenix Gun Co.

27.     SA Morales asked BOJORQUEZ if he was familiar with the process of purchasing a firearm. BOJORQUEZ said he knew you had to pass a background check and referenced the information required on the ATF Form 4473, such as the purchaser's full name, DOB, current home address, SSN was optional, and the question are you the actual buyer of the gun. SA Morales asked BOJORQUEZ if he was aware that lying on the ATF Form 4473 is a federal felony. BOJORQUEZ said he was aware of that.

28.     BOJORQUEZ stated he keeps his guns at his cousin's house, not a storage unit, because his cousin has a gun safe.

29.     We asked BOJORQUEZ what he planned on doing with the Barrett .50 cal that he purchased that morning, and he said he planned on taking it to a gun range somewhere and shoot it.

30.     SA Morales asked BOJORQUEZ out of the 10-15 guns he recently purchased how many had he sold. BOJORQUEZ stated he sold two guns.

31.     SA Morales asked BOJORQUEZ why some of the guns he purchased are being recovered in crimes. BOJORQUEZ said he did not know and is unaware what people do with the guns he sold to them. I asked BOJORQUEZ if he knew who he sold guns to and if he kept bills of sale. BOJORQUEZ said he did not know the buyers and did not keep bills of sale.

32.     BOJORQUEZ stated he would advertise his guns through Facebook using his phone. I asked BOJORQUEZ if he could show the SAs from his phone his posts on Facebook advertising his guns for sale and messages with the buyers. BOJORQUEZ said he deleted everything because he does not like it when he sells a gun and people continue sending him messages.

33.     BOJORQUEZ stated he also sold a firearm through Armslist.com and referenced selling a rifle in 2017.

34.     I asked BOJORQUEZ if he could show the SAs that same day, the 13 firearms he claimed to have stored at his cousin's house. BOJORQUEZ said his cousin would have to be home and is usually not home. SA Morales asked BOJORQUEZ if his cousin asked him to buy these guns for him and BOJORQUEZ said no. SA Morales asked BOJORQUEZ where his cousin lives and BOJORQUEZ said he does not know the address but lives in Avondale, AZ. BOJORQUEZ identified his cousin as Roman SALGADO.

35.     BOJORQUEZ said he does not keep his firearms at his sister's house because she is on probation.

8

36.     BOJORQUEZ said he pays about $300 a month for rent.

37.     SA Morales told BOJORQUEZ that he was driving with an expired registration. BOJORQUEZ said he was aware and that it was his sister's car [Silver Mazda]. BOJORQUEZ stated that he does not have a car because he does not like to have payments. BOJORQUEZ said he used to have a Jeep Commander, but it broke down.

38.     SA Morales asked BOJORQUEZ if he makes cash deposits of his earnings at his cousin's mattress business, and he said he does not.

39.     I asked BOJORQUEZ about his unemployment benefits, and he said he filed for unemployment because he could receive extra during the coronavirus pandemic. BOJORQUEZ said he was working as a Supervisor at Arizona Galvanizing Inc. but was not working the number of hours he needed so he stopped showing up for work and was ultimately terminated.

40.     SA Morales told BOJORQUEZ that what he was telling the SAs was not making sense. SA Morales further explained to BOJORQUEZ that he could not prove his $4,000 a month income, he claimed unemployment benefits, that he said he did not have a vehicle and was driving the Silver Mazda with an expired registration, and he spends $12,000 in cash to purchase a firearm. SA Morales said there is reason to believe he was straw purchasing firearms or flipping guns to make money just like the firearms he sold in the past.

41.     BOJOREQUEZ said that he could buy guns at a lesser price compared to some of the FFLs and flip them to make a profit. He added that people could sell firearms on GunBroker.com at double the retail price. BOJORQUEZ continued telling the SAs he was probably going to sell the other firearms too, the approximately 13 firearms he said he had. SA Morales asked BOJORQUEZ to be honest if he had already sold those firearms or at least half of them. BOJORQUEZ said, "yes", he had already sold at least half of the guns he purchased in 2021.

9

42.     BOJORQUEZ reported that he has five firearms at his cousin's house. However, he only listed four: Ruger 57; Colt 1911; Donald Trump gun; and Springfield Saint AR rifle.

43.     BOJORQUEZ reported that he meets people at gun shows and will sometimes conduct private sales. He gave an example: if he purchases a firearm for $600, he sells it for $1,000 making $400 in profit.

44.     SA Morales told BOJORQUEZ that she believed someone had asked him to purchase the Barrett .50 cal for them and what he was doing was engaging in the business of firearms without a federal license. SA Morales asked BOJORQUEZ where he was taking the Barrett .50 cal. BOJORQUEZ said that he was taking it to his sister's house and would wait for his cousin to get home so he could go drop it off at his house.

45.     SA Morales asked BOJORQUEZ if he was aware of where a Barrett .50 cal is a hot commodity, BOJORQUEZ replied, "in Mexico." SA Morales asked him how he knew this, and BOJORQUEZ said, "because all the songs, all the cartels, all the news, and everything". SA Morales asked BOJORQUEZ if someone asked him to take the Barrett .50 cal to Mexico and he said, "this one I would never take". I asked him which guns has he taken to Mexico, and he said none.

46.     I asked BOJORQUEZ about his regular border crossings, as in 2021, he had 18 border crossings. BOJORQUEZ said he visits Mexico often because his girlfriend lives in Tijuana. He said he last visited Mexicali about two weeks ago to meet up with his girlfriend and that he usually takes a shuttle. He reported to have friends and family in Mexico, including both his parents, who live in Guamuchil, Sinaloa. BOJORQUEZ said he also crosses through the Nogales port of entry about every 2-3 months to pick up his grandparents, who live in Phoenix, AZ with his brother, and also visit Mexico. BOJORQUEZ reported he planned on spending Christmas with his family in Sinaloa and had a flight departing from Tijuana on December 23, 2021. BOJORQUEZ showed the SAs his itinerary information from **Subject Cellular Telephone A-1** and referred at that point to **Subject Cellular Telephone A-1** as "my phone."

10

47.     BOJORQUEZ explained that he advertises his guns on Facebook by posting on Facebook that he had "found" a gun as opposed to expressly stating that he was "selling" a gun, because Facebook has guidelines that prohibit the sale of firearms through their website. BOJORQUEZ said he takes pictures of his guns with "my phone and uploads the photos on Facebook and Snapchat also using "my phone." BOJORQUEZ stated after he advertises this information on his social media accounts, other social media users will send him a message to purchase his guns.

48.     When SAs encountered BOJORQUEZ, a male SA searched his person for officer safety. During the search, two cellular telephones were found on BOJORQUEZ's person, specifically **Subject Cellular Telephones A-1 and A-2**. During the interview, BOJORQUEZ mentioned that he had recently purchased **Subject Cellular Telephone A-2**. BOJORQUEZ never stated or implied to agents that **Subject Cellular Telephones A-1 and A-2** belonged to or were used by any other person.

49.     BOJORQUEZ reported he sold four firearms through Snapchat and two through Facebook, and the remaining firearms through private sales to people he met at gun shows. BOJORQUEZ stated he has sold approximately 10 total firearms.

50.     SA Morales said to BOJORQUEZ that he lied on the ATF Form 4473 by providing a false address and making repetitive purchases of firearms for the purpose of resale for profit without an FFL, which is a violation of federal law. BOJORQUEZ stated he was flipping guns only during this time of year because of Christmas.

51.     BOJORQUEZ told the SAs that he made $40,000 in profit from selling firearms. BOJORQUEZ further explained that he sold two firearms for $10,000 each. He said he bought an RPD at a gun show "off-paper" for $7,000 and sold it to a military guy for $10,000. He purchased another RPD for $7,500 and sold it for $10,000. SA Morales asked BOJORQUEZ how long he had the RPD before selling it to the military guy, he said not long. BOJORQUEZ said he purchased the firearm on 12/04/2021, waited about a week for it to arrive and once he received it, he advertised the photos that he took using

11

the **Subject Cellular Telephone A-1**, and it sold a day or two after that [approximately nine days after purchase]. BOJORQUEZ added that he needed extra money.

52.     BOJORQUEZ provided the SAs his phone number for the **Subject Cellular Telephones**, 480-757-5622 for **Subject Cellular Telephone A-1**, and 480-869-7304 for **Subject Cellular Telephone A-2**.

53.     BOJORQUEZ provided the SAs consent to search the Silver Mazda and signed the ATF consent to search form.

54.     SA Morales told BOJORQUEZ this was his last chance to be truthful and asked him if ATF would find evidence of a crime in the **Subject Cellular Telephones**, specifically about the Barrett .50 cal., he said yes. I asked him where the Barret .50 cal was headed, and he said he did not know but he was told to drop it off at some guy's address.

55.     BOJORQUEZ explained that an unidentified Hispanic male approximately 5'6'' ft. tall, slim, baldheaded and possibly in his late 20s, went to the Glendale Residence and instructed him to meet with "primo," an unidentified Hispanic man with fair skin and slicked hair at the Ranch Market to pick up the money for the firearm. Primo was driving a newer white sedan when he met with BOJORQUEZ. BOJORQUEZ said Primo's cousin, who lives in Mexico, provided Primo with the Glendale Residence address, who showed up initially at the Glendale Residence. BOJORQUEZ stated that a lot of people know him since he does not have a criminal record. BOJORQUEZ said he did not know where the Barrett .50 cal was headed. BOJORQUEZ said that believed he would be provided with a fake address to meet up with a third individual and deliver the firearm. BOJORQUEZ said he was offered $2,000 to straw purchase the Barrett .50 cal. BOJORQUEZ stated the Barrett .50 cal was the only firearm he had straw purchased.

56.     SA Morales asked BOJORQUEZ about the people who asked him to purchase the Barrett .50 cal: did they give BOJORQUEZ any reason to believe that the firearm was headed to Mexico. BOJORQUEZ said "probably" but was not certain. SA Morales asked BOJORQUEZ if the Hispanic man who showed up to the Glendale

12

Residence appeared to be involved in drug dealing, and BOJORQUEZ said "probably". BOJORQUEZ said the individual was "classy" because he was wearing designer brand clothing like people who live in Mexico who are involved with the drug cartels.

57.    SA Morales explained to BOJORQUEZ that ATF was seizing the Barrett .50 cal and the **Subject Cellular Telephones**.

58.    BOJORQUEZ stated when he attempted to call back the phone number from one of the individuals involved with the straw purchase of the Barret .50 cal using the **Subject Cellular Telephones**, the phone number was no longer in service.

59.    SA Barrera asked BOJORQUEZ if the **Subject Cellular Telephones** contained evidence of other illegal activity and he said, "not anymore".

60.    BOJORQUEZ did not give consent to search the **Subject Cellular Telephones**.

61.    ATF SA's seized the **Subject Cellular Telephones** to obtain a search warrant.

62.    BOJORQUEZ was given a receipt for property for the **Subject Cellular Telephones** and the Barrett M107A1 .50 BMG rifle bearing S/N AE008417.

63.    BOJORQUEZ also signed a consent to forfeiture for the Barrett M107A1 .50 BMG rifle bearing S/N AE008417.

64.    The **Subject Cellular Telephones** are currently in the lawful possession of ATF. ATF seized the **Subject Cellular Telephones** during the execution of a firearm interdiction due to probable cause regarding BOJORQUEZ's admission of engaging in the straw purchase of a firearm and dealing firearms without a federal firearms license. Therefore, while the ATF might already have all necessary authority to examine the **Subject Cellular Telephones**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **Subject Cellular Telephones** will comply with the Fourth Amendment and other applicable laws.

65.    The **Subject Cellular Telephones** are currently located at 16212 N. 28th Ave, Suite 100, Phoenix, AZ 85053. In my training and experience, I know that the

13

**Subject Cellular Telephones** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Cellular Telephones** first came into the possession of the ATF.

### III.   ITEMS TO BE SEIZED

66.     Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the **Subject Cellular Telephones**.

67.     Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows that individuals engaging in the business of unlicensed firearms dealing and straw purchasing of firearms commonly use cellular telephones to communicate with other individuals involved in similar weapon offenses and customers about firearm-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet and application-based communication forums. Moreover, violators of Federal firearms laws commonly use other capabilities of cellular telephones to further the illicit trade of firearms. Therefore, evidence related to firearms trafficking activity is likely to be found on the **Subject Cellular Telephones**.

68.     Both of the **Subject Cellular Telephones** were found on BOJORQUEZ's person at the traffic stop. BOJORQUEZ admitted that he had exchanged phone calls with various people involved in his straw purchase of the Barrett .50 cal. BOJORQUEZ also admitted that he had used both of the **Subject Cellular Telephone A-1** to post firearms for sale on Facebook, Snapchat, and gun trading websites like Gunbroker.com and Armslist.com. He further admitted that he had exchanged messages with potential and actual buyers of those firearms using **Subject Cellular Telephone A-1**.

69.     In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any

articles tending to establish the identity of persons who have dominion and control over the **Subject Cellular Telephones**.

## IV. DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE

70.    As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the **Subject Cellular Telephones**. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

71.    *Probable cause.* I submit that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the **Subject Cellular Telephones** for at least the following reasons:

   a.    I know that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

   b.    Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in

15

electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

      c.     Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

      d.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

72.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the **Subject Cellular Telephones** because:

      a.     Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

16

     b.    As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner. Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used. For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into

the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.      A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

      d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

73.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise

18

copying the contents of the **Subject Cellular Telephones**, including the use of computer-assisted scans.

74.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.     CONCLUSION

75.     I submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 922 (a)(1)(A) Dealing Firearms Without a License, and 18 U.S.C. § 924(a)(1)(A), False Statement in the Purchase of a Firearm, are likely to be found in the contents of the **Subject Cellular Telephones** further described in Attachments A-1 and A-2.

_____
Special Agent Alejandra Barrera
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me this ____ day of February, 2022.

_____
HONORABLE JOHN Z. BOYLE
United States Magistrate Judge

19